## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SHORT BARK INDUSTRIES, INC., *et al.*,[1] | Case No. 17-11502 (KG) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF PHIL WILLIAMS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

**I, PHIL WILLIAMS,** hereby declare, under penalty of perjury, as follows:

1.      I serve as the Chief Executive Officer ("CEO") and Sole Director of the above-captioned debtor and debtor-in-possession Short Bark Industries, Inc. ("SBI").  I am also the Manager of debtor and debtor-in-possession EXO SBI, LLC ("EXO", collectively with SBI, the "Debtors").  While I have only served as CEO of SBI for a short period of time, I previously served as the Vice President of Operations for two and a half years.  In my capacity as CEO of SBI and Manager of EXO, I am familiar with the financial affairs of each of the Debtors.  I perform my duties out of SBI's headquarters located in Vonore, Tennessee.

2.      I submit this declaration (the "First Day Declaration") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "First Day Motions").[2]

3.      On July 10, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors request joint administration of the cases of Short Bark Industries, Inc. (Bankr. Case No.: 17-11502 KG) and EXO SBI, LLC (Bankr. Case No.: 17-11501 KG).

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day Motion.

Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.    Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' respective operations and financial conditions.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.    Part I of this First Day Declaration provides a summary of these chapter 11 cases (collectively, the "Cases") and describes in more detail the Debtors' businesses, corporate structure and history, capital and debt structure, developments which led to the Debtors' chapter 11 filings, and the Debtors' goals during these Cases.  Part II sets forth the relevant details of the various First Day Motions.

## I.    INTRODUCTION AND BACKGROUND

### A.    Business Operations

#### *Overview*

6.    SBI provides high quality body armor, apparel, and accessories for military, government, and police force use. SBI is the leading company that offers concealed, patented, customized body protection.  SBI's primary customer is the United States Government (the "Government").  SBI manufactures apparel products such as combat shirts, combat jackets, and

other combat uniforms and garments, as well as associated items such as modular lightweight load-carry equipment rucksacks and assault packs.  As noted, SBI's primary source of revenue is through Government contracts.

7.      In addition, SBI manufactures uniforms for Superior Uniform Group who ultimately provides uniforms to Walmart.  Superior is currently in SBI's Puerto Rican facilities making provisions to double the manufacturing capabilities from 28,000 uniforms a week to 45,000 uniforms a week.  This is a huge source of profit because Superior supplies all of the materials and SBI only has to provide the labor.

8.      SBI is an SBA approved and HUD Zone approved, so it has special preference for winning additional government contracts.  Over the past 3 years, many of the major apparel manufacturers closed so with the resurgence for military apparel, the government contracts exceed current capacity.  With proper funding, SBI could bid on and be awarded an additional $100 million of government contracts.

9.      Currently, SBI is on track to have gross sales of approximately $35,000,000.00 and approximately $5,000,000.00 of EBIDTA.  Further, SBI has close to $225,000,000.00 of awarded Government contracts, specifically, SBI is currently working on an awarded $45,000,000.00 "Ballistic Combat Shirt" contract for the Government.  Aside from being very profitable this contract will ensure the Company's future and profits.

10.      SBI has been profitable for the last two (2) months.  Additionally, with recent, pre-petition, changes that I have effectuated expenses of SBI will drop by approximately $80,000.00 per month.

11.       SBI maintains a website at http://www.shortbark.com (last visited July 10, 2017).

*__Operational Footprint__*

12.     SBI is headquartered in Vonore, Tennessee, and operates three (3) manufacturing facilities in Guanica, Puerto Rico.  SBI employs approximately 535 people, most of which assist in the manufacturing facility in Puerto Rico.

**B.     Corporate Structure**

13.     SBI is a corporation formed in 2006 under laws of the Commonwealth of Puerto Rico.  Through EXO's purchase agreement of SBI dated June 3, 2014, EXO has operational approval of  SBI.  EXO is a Delaware corporation.

14.     I am the sole Director of SBI.  I am also the Manager of EXO.

**C.     Capital and Debt Structure**

15.     Because of significant receivables generated from SBI's contracts with the Government, SBI's primary source of funding is through a Factoring and Security Agreement with LSQ Funding Group, LLC ("LSQ").  Set forth below is a description of the Debtors' capital and debt structure, including the relationship with LSQ, to date.

*__LSQ Secured Debt__*

16.     On January 10, 2013, SBI entered into the Factoring and Security Agreement (the "Factoring Agreement") with LSQ.  The Factoring Agreement was subsequently amended on May 14, 2015 and again on January 7, 2016.  The Factoring Agreement, along with these amendments, provides for a pledge to LSQ of substantially all of the assets of SBI.  Upon information and belief, LSQ filed UCC-1 financing statements to perfect its interests in SBI's collateral.  Pursuant to the Factoring Agreement, LSQ factored the receivables of the Government pursuant to the contracts between the Government and SBI.  Notably, not all of the Debtors' receivables have been factored.

17.     As a result of obligations that were owed under the Factoring Agreement, and alleged defaults by SBI, SBI and LSQ entered into a Forbearance Agreement dated October 25, 2016 (the "Forbearance Agreement").[3]   In the Forbearance Agreement, SBI stipulated that it owed LSQ the sum of $3,376,177.37 and agreed to the appointment of Cedar Croft Consulting, Ltd. as its chief restructuring officer.  LSQ agreed pursuant to the Forbearance Agreement agreed to forego pursuing claims arising from any alleged defaults for a period of 90 days.   The Forbearance Agreement was extended on three (3) separate occasions.  Due to these extensions, the forbearance term was extended to August 31, 2017.

18.     On July 3, 2017, LSQ terminated the Forbearance Agreement based on alleged defaults by SBI.   In the default letter issued by LSQ, LSQ asserted that it was owed $9,598,281.11 based upon the Factoring Agreement and the Forbearance Agreement.   The Debtors dispute that this is the correct amount currently owed, and have requested information from LSQ to support this purported debt amount.   LSQ has yet to provide any supporting documentation.  In addition, based on some financial documentation that the Debtors maintained and have reviewed, the Debtors believe that since September 2016, SBI has paid over $1.2 million in fees, costs and expenses to LSQ-related professionals, consultants, counsel, and advisors.  This amount includes over $800,000.00 paid to Cedar Croft Consulting, Ltd. since September 2016.

### *Unsecured Debt – Trade Debt*

19.     As of the Petition Date, the Debtors have approximately $7.1 million of unsecured accounts payable owed to approximately fifty (50) trade vendors.

## E.     Events Leading Up To These Chapter 11 Cases

---

[3] This Forbearance Agreement was executed without required approval of SBI's Board.

20.     The business relationship between the Debtors and LSQ has deteriorated over the last few months culminating in actions that took place on Friday, July 7, 2017, which necessitated that the Debtors filed these Cases on an emergency basis.

21.     As reflected above, LSQ and Short Bark entered into the Forbearance Agreement, and various amendments thereto, to address certain obligations owed by Short Bark to LSQ, which (despite the forbearance extension) LSQ terminated on July 3, 2017.  I recently learned that LSQ executed a Letter of Intent ("LOI") with Superior Uniform Group ("Superior"), a public traded entity that currently contracts with SBI and owes SBI approximately $1,700,000 in receivables.  While not disclosing the specific terms of the arrangement, I understand that the LOI will allow Superior to purchase the SBI's for substantially less than market value.  I also believe that this transaction is a primary reason for LSQ's unforeseen, unprovoked and unilateral cancelation of the Forbearance Agreement that was to run through August 31, 2017.  LSQ cited lawsuits as the reason for the cancelation of the Forbearance Agreement, but these SBI lawsuits were filed against SBI long before the forbearance extensions, and I believe LSQ was aware of them.  Ultimately, I believe that this proposed sale transaction to Superior will harm all the creditors and stakeholders except LSQ, and as such, this transaction must face the scrutiny of a bankruptcy process.

22.     Under the Forbearance Agreement and subsequent extensions, LSQ has control over all of SBI's cash receivables, including non-factored receivables, and deposited the funds into LSQ-controlled bank account (the "Lockbox"), with no accounting or reporting provided to SBI.  Although I am unclear of the exact amount that is currently in the Lockbox, I believe the millions of dollars collected and due are substantial and sufficient to pay the Debtors' operating expenses for the immediate future.  Notwithstanding that these amounts are removed daily by

6

LSQ, I believe that some, if not all, of these monies, which are the sole derivative of SBI's accounts receivables, are the property of the Debtors' estate.

23.     On July 4, 2017, the SBI Board terminated Cedar Croft Consulting, Ltd as chief restructuring officer and suspended Lisa Janke as chief executive officer without pay.  Cedar Croft paid themselves substantial and exorbitant monthly 'fees' without accountability or oversight.  In the past eight (8) months, I believe Cedar Croft may paid monies to LSQ of approximately $4.8 to $5.6 million that were owed to SBI and paid by Superior.  So the SBI Board terminated Cedar Croft and then appointed me as the chief executive officer.  Since the factoring agreement was terminated by LSQ, I directed SBI's CFO to change payments back to the SBI bank accounts with the intention of paying LSQ what was due and owed, rather than the 18%+ interest rates plus the nearly million paid and owed to LSQ for fines and penalties and the nearly $1.3 million paid to LSQ designees, like investment bankers hired to find a buyer for LSQ, as well as consultants working on behalf of LSQ.

24.     In addition, sensing that LSQ was going to take legal action against SBI, SBI engaged restructuring counsel to evaluate and prepare bankruptcy petitions for SBI and EXO.  Notwithstanding that, LSQ and SBI continued discussions: first, to ensure that immediate and important obligations of SBI, including payroll, were made; and second, to negotiate potential consensual resolution of the disputes herein.

25.     Despite those discussions, on July 7, 2017, LSQ proceeded forward with a federal lawsuit in the United States District Court for the Middle District of Florida, Orlando Division (the "Florida Federal Court").  That lawsuit, among other things, sought the immediate appointment of a receiver to take control of the assets of SBI.  The justification for the receiver was based on a stipulation signed by Lisa Janke (the former CEO of SBI) and SBI's prior

counsel at the time of the Forbearance Agreement.  That stipulation allowed for the appointment of a receiver if a default was called by LSQ under the Forbearance Agreement.

26.    Late in the afternoon on July 7, 2017, the Florida Federal Court issued an order approving the stipulation appointing Mark Iammartino as the receiver (the "Receiver") for SBI. Notwithstanding the appointment of the Receiver, I believe that it was appropriate for the Board of SBI to initial these Chapter 11 Cases in order to protect the Debtors' assets, business, potentially reorganize in a controlled and managed process in this Court, and sort out the UCC-1 liens so that the proper parties have access to the assets pledged by their promissory notes and corresponding issued UCC-1's.

**F.    Debtors' Goals in These Chapter 11 Cases**

27.    The Debtors intend to use these Cases to pursue a competitive auction, sale transaction, or investment transaction in the Debtors to maximize the value of the Debtors' business and assets for the benefit of all stakeholders.  At the time of the lawsuit in Florida Federal Court, the Debtors were prepared to meet with a potential third-party investor who has expressed interest in a potential $15 million investment and/or sale transaction for SBI that would inject the necessary capital and liquidating to allow SBI to continue as a successful operation.  With the appointment of the Receiver, that potential transaction is in jeopardy. Nonetheless, the Debtors believe that a controlled, competitive investment or sale process in front of this Court is the best course of action and in the best interests of all creditors – not just LSQ.

## II.    FIRST DAY MOTIONS

**A.    Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of Debtors' Chapter 11 Cases for Procedural Purposes Only**

28.     The Debtors request the joint administration of the Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for the Cases under the Short Bark Industries, Inc. case and also request that the caption of each of the Cases be modified to reflect the joint administration of the Cases.  Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Cases for purposes of noticing creditors of the Debtors' estates.

29.     The Debtors are direct and indirect affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code.  Joint administration of the Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Cases.  Joint administration will also permit the Clerk to use a single general docket for the Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Cases will be apprised of the various matters before the Court in each of the Cases.

30.     I believe that if the Court approves joint administration of the Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Cases and ease the onerous administrative burden of having to file documents in more than one case.  I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estate.  Based on the foregoing, the Debtors believe that joint administration of the Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted.

**B.      Motion of the Debtors for Entry of an Interim Order and Final Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing**

**Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management Systems, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B) (the "Cash Management Motion")**

31.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the maintenance of their Bank Accounts and continued use of existing Business Forms; (ii) authorizing but not directing the continued use of their existing Cash Management System; and (iii) providing any additional relief required in order to effectuate the foregoing.  The Debtors also request the right, in their discretion, to (i) pay any Bank Account related fees; and (ii) close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate the Cases and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Cases.

32.     Further, the Debtors request that the Court waive the requirements of Bankruptcy Code section 345(b) on an interim basis and permit the Debtors to maintain their deposits in the Bank Accounts in accordance with existing deposit practices until the Debtors obtain this Court's approval to deviate from the guidelines imposed under Bankruptcy Code section 345(b) on a final basis.  The Debtors' existing deposit practices are significantly less burdensome and more appropriately tailored to their business needs than the practices otherwise required under the Bankruptcy Code and by the U.S. Trustee Guidelines.

33.     The continued use of the Cash Management System and the Bank Accounts during the pendency of these Cases is essential to the Debtors' business operations.  The Debtors will (to the best of their ability) continue their ordinary course of business, which will include such everyday expenses as marketing, producing the military apparel and their other goods, and consequently continuing to pay employees (see also Subsection C of this Part, *infra*).  The

Debtors believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtors' business needs and operations.  To require the Debtors to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates.  Moreover, permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

34.    The Cash Management System is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to:  (i) control and monitor corporate funds; (ii) ensure cash availability; (iii) accept certain foreign currencies; and (iv) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information.  Moreover, continued operation of the Cash Management System is crucial to the Debtors' ongoing business operations.

35.    Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations.  Such a result would cause significant harm to the Debtors' businesses and the value of their estates.  Accordingly, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**C.    Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other <u>Associated Obligations (the "Employee Wages and Benefits Motion")</u>**

36. By the Employee Wages and Benefits Motion, the Debtors seek entry of entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or perform, as applicable, prepetition obligations to current employees including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (b) maintain and continue to honor their practices, programs, and policies for their employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Debtors' various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (c) pay all related prepetition withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

37. As of the Petition Date, the Debtors employ approximately 535 employees (the "Employees"). Thee Employees are full-time salaried personnel and part-time hourly workers.

38. The Debtors' Employees perform a variety of critical functions, including developing and selling the Debtors' products and services, manufacturing the Debtors' goods, running their business and technical operations, supporting customers, performing general and administrative services, providing financial services, and other related tasks. The Employees'

skills, knowledge, and understanding of the Debtors' operations and business relations are essential to the effective operation of the Debtors' businesses.

39.     In the ordinary course of business, the Debtors incur payroll obligations for salaries, commissions and hourly wages owed to their Employees.  Salaries and hourly wages for the Employees are paid twice a month.  The average total weekly payroll obligations are approximately $195,000.00 for the Employees.  As of the Petition Date, the Debtors estimate that they owe $195,000.00 to their Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations").  The Debtors seek the authority to pay and honor Prepetition Wage Obligations in an amount not to exceed $250,000.00 in the aggregate for Employees, and to continue to honor the Employee Wage Obligations on a post petition basis in the ordinary course of business.

40.     The Employees are essential to the continued operation of the Debtors' businesses, and the Employees' morale directly affects their effectiveness and productivity.  The Debtors can only survive these Cases if their full workforce continues to operate, which will only be possible if all wages, taxes, benefits, and other associated costs and fees are paid – whether incurred pre-petition or post-petition. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  A loss of employee morale and goodwill at this critical juncture would undermine the Debtors' stability, and undoubtedly would have an adverse effect on the Debtors, their customers, the value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

41.     I believe that payment of all Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain their qualified and

13

highly-skilled employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief (the "Cash Collateral Motion")**

42.      By the Cash Collateral Motion, the Debtors request entry of an Interim Order, and the Final Order (together with the Interim Order, the "**Cash Collateral Orders**") that, among other things:

> a.      authorizes the Debtors to use Cash Collateral, including Cash Collateral in which one or more of the Debtors' creditors may have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order, or otherwise;
>
> b.      vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;
>
> c.      schedules a final hearing on the Cash Collateral Motion (the "**Final Hearing**") to be held no later than 21 calendar days after the entry of the Interim Order to consider entry of the Final Order that grants all of the relief requested in this Cash Collateral Motion on a final basis and which Final Order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court);

43.      The Debtors need the use of Cash Collateral in order to fund their ordinary course of business operations and administration.  Accordingly, to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

44.      The Debtors' primary concern at this early stage of their bankruptcy proceedings is to ensure that their business operations continue to move ahead as smoothly as possible during. The continued use of cash collateral will allow the Debtors to continue operating so that they can continue with their reorganization by proposing a plan to satisfy the claims of their creditors.

45.     The Debtors propose to provide adequate protection to its secured creditors in the form of a replacement lien of the same extent, priority, and validity as existed pre-petition (to the extent that any lien existed), and adequate protection payments on a monthly basis in an amount to be determined.

46.     I believe that this Court's approval of the Cash Collateral Motion is important for the continued operations of the Debtors' business, and as such is in the best interests of all creditors and stakeholders in this case.

### III.     CONCLUSION

47.     For the reasons described herein and in the First Day Motions, I believe that the Debtors can continue their businesses and operations, so long as they receive the relief they request.  The relief requested in the First Day Motions will permit the Debtors to continue their normal business operations and maintain the value of the Debtors' business and other goods the Debtors own and/or produce. The Debtors' reorganization will benefit not only LSQ, but also employees, unsecured creditors, and other stakeholders.  For these reasons, on behalf of the Debtors, I respectfully request that the Court grant the relief requested in each of the First Day Motions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  July 11, 2017                    /s/ Phil Williams
                                         Phil Williams
                                         Chief Executive Officer