# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SHORT BARK INDUSTRIES, INC., et al.,[1] | Case No. 17-11502 (KG) |
| Debtors. | Jointly Administered |
| | Proposed Hearing Date: August 24, 2017 at 2:30 p.m. (EDT) |
| | Proposed Objection Deadline: At the hearing |

### DEBTORS' MOTION FOR AN ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE STALKING HORSE BUYER; (II) APPROVING BIDDING PROTECTIONS AND PROCEDURES AS REQUIRED BY THE STALKING HORSE BUYER; AND (III) GRANTING RELATED RELIEF

Short Bark Industries, Inc. ("**SBI**") and EXO SBI, LLC ("**EXO**," and together with SBI, the "**Debtors**"), hereby submit this motion (this "**Motion**") for entry of an order (I) approving an asset purchase agreement between the Debtor and Holliston Holdings, LLC (the "**Stalking Horse Buyer**" or the "**Purchaser**"); (II) approving bidding protections and procedures, including a breakup fee and expense reimbursement, as required by the Stalking Horse Buyer; and (III) granting related relief (the "**Approval Order**"). In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

---

[1]      The Debtors in these jointly administered cases are Short Bark Industries, Inc. (Tax ID: 66-0655657) and EXO SBI, LLC (Tax ID: 46-5210695)).

"**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  The statutory predicates for the relief requested herein are sections 105(a), 363, 364, 365, 503, 507 and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 6004-1.

## Background

2.   On July 10, 2017 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.   A Committee of Unsecured Creditors (the "**Committee**") was appointed on July 18, 2018 [D.I. 41].

3.   Concurrently herewith, the Debtors are filing their *Motion to Shorten Notice with Respect to Debtors' Motion for an Order (I) Approving the Asset Purchase Agreement Between the Debtors and the Stalking Horse Buyer; (II) Approving Bidding Protections and Procedures as Required by the Stalking Horse Buyer; and (III) Granting Related Relief* (the "**Motion to Shorten Notice**") seeking to shorten the notice period for a hearing on this Motion.

## Facts Specific to the Relief Requested

4.   SBI provides high quality body armor, apparel, and accessories for military, government, and police force use. SBI is the leading company that offers concealed, patented, customized body protection.  SBI's primary customer is the United States Government (the "**Government**").  SBI manufactures apparel products such as combat shirts, combat jackets, and

other combat uniforms and garments, as well as associated items such as modular lightweight load-carry equipment rucksacks and assault packs. SBI also manufactures uniforms for Superior Uniform Group, who ultimately provides uniforms to Walmart.

5.      Prior to and on the Petition Date, the Debtors were exploring options to sell their business. The Debtors hired SSG Advisors, LLC ("**SSG**") and Young America Capital, LLC ("**YAC**" and, collectively with SSG, the "**Advisors**") as their investment bankers to market the Debtors' assets and business with the hope that value-maximizing transaction could be achieved promptly.

6.      As further background, prior to the Petition Date, the Debtors retained the Advisors in an effort to determine their financial possibilities. On December 12, 2016, SSG was retained to assist YAC in a marketing process for SBI's assets, which began in March 2016. The Advisors worked together to determine a plan of action based upon the Debtors' cash position and other factors.

7.      From March 2016 through February 2017, the Advisors contacted over two hundred (200) parties, including lenders and strategic buyers, in an effort to market the Debtors as a ripe investment. From these contacts, approximately fifty (50) confidentiality agreements were executed, and multiple offers were made to purchase LSQ's position on the Debtors' assets.

8.      During this period, there were a number of potential transactions with certain parties to purchase either the assets of Debtor SBI, or to purchase the debt position of LSQ. For various reasons, those transactions were not consummated.

9.      On August 2, 2017, upon the Debtors' motion and after notice and hearing, the Court entered the *Order: (A) Approving Bidding Procedures in Connection with the Sale of Substantially All Assets of the Debtors (B) Scheduling an Auction and Hearing to Consider the*

*Sale of Assets and (C) Approving the Form and Manner of Notice Thereof* [D.I. 96] (the "**Bidding Procedures Order**").

10. The Bidding Procedures Order provides that the Debtors can solicit and receive bids for the sale of the Debtors' assets, in compliance with the terms and procedures set forth in the Bidding Procedures Order, with the bid deadline being September 15, 2017. at 5:00 p.m. prevailing Eastern Time (the "**Bid Deadline**") and the auction to take place on September 18, 2017, at 10:00 a.m. prevailing Eastern Time (the "**Auction**"). Any objections with respect to the conduct of the auction must be filed and served prior to the Commencement of the sale hearing, which is scheduled for September 19, 2017, at 4:00 p.m. prevailing Eastern Time (the "**Sale Hearing**"). Any objections to the sale of the Debtors' assets, other than with respect to the conduct of the auction, must be filed and served so as to be received before September 12, 2017, at 4:00 p.m. prevailing Eastern Time. The Bidding Procedures Order also contemplates that the Debtors may select a stalking horse buyer and seek subsequent Court approval of the stalking horse asset purchase agreement and additional bid protections sought by a stalking horse buyer.

11. On August 23, 2017, the Debtors and the Stalking Horse Buyer executed the Asset Purchase Agreement (the "**APA**"). The APA is attached hereto as <u>Exhibit A</u>. In particular, the APA provides that the Stalking Horse Buyer will purchase substantially all of the assets of the Debtors (except the Excluded Assets, as defined in the APA) for the following consideration: (i) $590,000.00 in cash; plus (ii) the book value of Inventory at Closing; plus (iii) $30,000.00 in cash on account of any and all causes of action, including causes of action under Chapter 5 of the Bankruptcy Code, against Lisa Janke, plus (iv) the assumption of certain liabilities, and subject to other purchase price adjustments as contained in the APA (the "**Stalking Horse Bid**"). The relevant provisions of the APA are summarized below.

**Relief Requested**

12. By this Motion, the Debtors seek the entry an order: 1) approving the APA; 2) approving bidding protection and procedures as required by the stalking horse buyer; and 3) granting related relief.

**I.    THE PROPOSED STALKING HORSE BUYER APA**

13. The APA with the Stalking Horse Buyer provides for the following key terms[2]:

| Provision | Description of Provision |
|---|---|
| Sale of Assets<br>*Local Rule 6004-1(b)(iv)* | The APA includes the following:<br><br>*At Closing, Sellers will sell, assign, transfer, convey, grant and deliver, or cause to be sold, assigned, transferred, conveyed, granted and delivered, to Purchaser, and Purchaser will purchase from Sellers, all right, title and interest of Sellers in, to and under the Purchased Assets, as the same exist as of the Closing Date, free and clear from all Liens, other than Permitted Liens.  For purposes of this Agreement, "Purchased Assets" means all assets primarily used or held for use in the Business by Sellers (other than goods held under bailment arrangements) which are located at the various business locations, including the Headquarters[.]* (the "Acquired Assets").<br><br>*See* Section 1.1 of APA |
| Excluded Assets<br><br>*Local Rule 6004-1(b)(iv)* | The APA includes the following as a list of excluded assets not being sold to the Stalking Horse Buyer:<br><br>*(a)    tax Returns, tax refunds and other records not exclusively related to the Business;*<br><br>*(b)    all cash or cash equivalents, including bank accounts of the Business;*<br><br>*(c)    all Accounts (including accounts receivable), choses in action (if any) that directly relate to said Accounts and Contract Rights, and Contract Rights of the Business and any and all rights to payment from any third-party with respect to* |

---

[2] The summary of terms of the APA is provided for convenience only and parties should review the APA in its entirety.

| Provision | Description of Provision |
|---|---|
| | *the Business* <br><br> *(d)  the capital stock of each Seller;* <br><br> *(e)  all executory contracts which are not Assumed Contracts; and* <br><br> *(f)  insurance premium rebates and insurance premium refunds and insurance claims and proceeds thereof, to the extent they relate to any property for which repairs have been completed and fully paid for prior to Closing.* <br><br> *See* Section 1.2 of the APA. |
| Purchase Price <br><br> Local Rule 6004-1(b)(iv) | *Subject to the reimbursements provided in Section 1.1 and the adjustments provided for in Section 2.5, Purchaser shall pay the following consideration for the Purchased Assets: $590,000.00 in cash; plus the book value of Inventory at Closing; plus $30,000.00 in cash on account of any and all causes of action, including causes of action under Chapter 5 of the Bankruptcy Code, against Lisa Janke (collectively, the "Purchase Price"). However, in no event shall the Purchase Price exceed a total of $3,120,000.00.* <br><br> *See* Section 2.2 of the APA. |
| Releases <br><br> Local Rule 6004-1(b)(iv)(C) | The APA contains the following language: <br><br> *Lisa Janke shall be fully, completely, and irrevocably released from any and all liability, if any, to LSQ.* <br><br> *See* Section 6.9 of the APA. |
| Closing Date <br><br> Local Rule 6004-1(b)(iv)(E) | *Subject to the conditions set forth in Sections 6 and 7, the closing (the "Closing") of the Transaction shall take place on or before October 13, 2017, or at such other place, time or date as may be mutually agreed by parties (the "Closing Date"). All transfers hereunder will be deemed to have been made simultaneously and will become effective and legal and equitable title to the Purchased Assets will pass to Purchaser, as of 11:59 p.m. (Eastern Time) on the Closing Date.* <br><br> *See* Section 2.1 of the APA. |
| Good Faith Deposit | *Within five (5) business days of the execution of this Agreement, Purchaser shall deposit with an escrow agent agreed to by the Sellers,* |

| Provision | Description of Provision |
|---|---|
| Local Rule 6004-1(b)(iv)(F) | *Purchaser and LSQ ("Escrow Agent") as earnest money the sum of $156,000.00 ("Earnest Money Deposit"). Purchaser shall be entitled to refund of the Earnest Money Deposit during the Due Diligence Period (defined below) if Purchaser notifies Sellers in writing prior to the expiration of the Due Diligence Period of its desire to not proceed with the Transaction and Closing under this Agreement. At the expiration of the Due Diligence Period, absent notice by Purchaser to Sellers as set forth in the preceding sentence, the Earnest Money Deposit shall be nonrefundable unless (a) Purchaser is outbid and the Sellers elect to terminate this Agreement or (b) Sellers become unable to close the transaction. . The Purchase Price less the Earnest Money Deposit shall be due and payable in cash at Closing. Should the Sellers accept a higher offer, or if this agreement shall be terminated during the Due Diligence Period, the Earnest Money Deposit shall be returned by the Escrow Agent within five (5) business days of Purchaser's written request for a return of said Earnest Money.*<br><br>*See* Section 2.2 of the APA. |
| Interim Arrangements<br><br>Local Rule 6004-1(b)(iv)(G) | *Purchaser shall have delivered to Sellers the Transition Services Agreement in the form attached [to the APA] as Exhibit A, duly executed by Sellers and Purchaser.*<br><br>*See* Section 7.2(d) of the APA. A true and correct copy of the Transition Services Agreement is attached to the APA as Exhibit A. |
| Record Retention<br><br>Local Rule 6004-1(b)(iv)(J) | *Following the Closing, the Purchaser shall retain, at the Purchaser's sole expense, for three (3) years following the Closing Date, all original tax-related and general business records for the Business delivered to the Purchaser by the Sellers at Closing, and the Sellers shall have the right to reasonable access to such records upon reasonable prior notice to the Purchaser and during business hours.*<br><br>*See* Section 5.9 of the APA. |
| Break-Up/Topping Fees and Expense Reimbursement<br><br>Local Rule 6004-1(b)(iv)(D), 6004-1(b)(iv)(G), 6004-1(c)(1)(C)(2) and 6004-1(c)(1)(C)(4) | The APA provides that:<br><br>*As part of this Agreement, Purchaser shall be denominated the stalking horse whose bid for the sale of assets as contemplated under this Agreement will be subject to the right of overbid and topping bid by potential third-party purchasers. In the event that a third-party purchaser outbids Purchaser's offer under the terms of this Agreement,* |

| Provision | Description of Provision |
|---|---|
| | *Purchaser shall be entitled to a break-up fee of $93,600.00 (the "Break-Up Fee", plus an expense reimbursement of up to $90,000.00 in documented, out of pocket costs (the "Expense Reimbursement"). The initial topping bid must exceed Purchaser's bid by at least $300,000.00.* <br><br> See Paragraph C, section 8.1(f) of the APA. <br><br> The APA further provides that: <br><br> *Purchaser shall be entitled to a due diligence period that expires upon the entry of the Order naming the Purchaser as the Stalking Horse ("Due Diligence Period") to investigate the business operations and financial performance of Sellers.* <br><br> See Section 2.3 of the APA. |
| Avoidance Actions <br><br> *Local Rule 6004-1(b)(iv)(K)* | The APA provides that: <br><br> *The Purchaser shall receive from the Sellers all Bankruptcy Code Chapter 5 avoidance action claims solely against Lisa Janke, including preference and fraudulent transfer claims, against her.* <br><br> See Sections 1.1(o), 6.7 of the APA. |

**Basis for Relief Requested**

**I.    APPROVING THE APA AND ADDITIONAL BIDDING PROCEDURES AND PROTECTIONS**

14.    Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

15.    Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business

judgment on the part of the debtor, such use should be approved. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"). *See also Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)) (noting that the Court defers to the trustee's judgment so long as there is a legitimate business justification); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. S*ee Pitt v. First Wellington Canyon Assocs.* (*In re First Wellington Canyon Assocs.*), No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's

9

business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

16. The "sound business reason" test requires a trustee or debtor in possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor in possession has obtained a fair and reasonable price; and (4) that the trustee or debtor in possession acted in good faith. *Abbotts Dairies*, 788 F.2d 143; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *see also Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Lionel*, 722 F.2d at 1071.

### A. The APA Should be Approved

17. In this case, as set forth more fully herein, the Debtors submit that the decision to enter into a sale transaction with the Stalking Horse Buyer is based upon sound business judgment and should be approved. Ample business justification exists to support the decision to sell the Debtors' assets pursuant to the Bidding Procedures Order and in accordance with the APA, thereby satisfying the first prong of *Abbotts Dairies*. The sale of the Debtors' assets presents the best opportunity to maximize value for their estates, and the APA is the best method by which the Debtors can promote a competitive sale process. The Debtors have already engaged in protracted attempts to sell their assets; the shortened time frame for this proposed sale process is therefore justified under the circumstances. The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for their assets.

18. In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties. Accordingly, the proposed sale of the Debtors' assets satisfies the second prong of the *Abbotts Dairies* standard.

19. The APA is designed to maximize the value received for the Debtors' assets and to avoid the potential for a maximum bid that would fail to adequately compensate the Debtors for the sale of their assets. The Debtors respectfully submit that the relief sought by this Motion is reasonably calculated to maximize value for the benefit of the Debtors and all stakeholders.

20. The APA provides for the potential sale of the Debtors' assets at a reasonable price that will provide a floor for other potential bids. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Debtors' assets will be fair and reasonable, and therefore the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

**B.     The Proposed Break-Up Fee and Expense Reimbursement is Appropriate Under the Circumstances**

21. The APA provides for the Break-Up Fee to the Stalking Horse Buyer in the amount of $93,600.00 and the Expense Reimbursement in an amount of up to $90,000.00.

22. The payment of the Break-Up Fee and Expense Reimbursement will be triggered if a third-party bidder places a bid at the Auction for an amount that exceeds the bid of the Stalking Horse Buyer, and that third-party bidder is ultimately selected as the winning bidder and closes on its winning bid.

23. Bid protections are standard and oftentimes necessary components of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. Bid protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and

uncertainties of the chapter 11 process. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 660 (Bankr. S.D.N.Y. 1992) ("Break-up fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking" and the expenses it incurs by having its offer held open, subject to higher and better offers); *see also In re ALC Holdings, LLC*, Case No. 11-13853 (MFW) (Bankr. D. Del. Jan. 10, 2012) (approving expense reimbursement in favor of stalking horse purchaser that also served as administrative agent and postpetition lender).

24. Proposed bid protections should be approved in cases where implementing them would serve the best interests of the estate. *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Typically, this means that some benefit must be provided to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) ("Such fees [to the stalking horse bidder] could be awarded under [section 503] only if [its] participation in the bidding process was necessary to accord the estate an actual benefit."); Integrated Res., 147 B.R. at 660 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.").

25. In *Calpine Corp.*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. Calpine Corp., 181 F.3d at 536. More specifically, the court determined that whether these protections were "necessary" depended on whether they provided a benefit to the debtor's estate by promoting competitive bidding or researching the

value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. Id. at 537. Here, the Debtors believes that approval of the Break-Up Fee and Expense Reimbursement will create such a competitive bidding process because these bid protections have assisted in bringing the Stalking Horse Buyer to the table, which protections the Stalking Horse Buyer has insisted on being approved for it to move forward with this transaction.

26. A proposed break-up fee and expense reimbursement should be approved so long as it is reasonable in light of a stalking horse bidder's projected efforts and, in terms of its percentage and amount, is of the same order of magnitude as break-up fees approved in other cases. Courts typically approve break-up fees that are capped at 3% of the stalking horse bid. *See, e.g., In re Global Home Products LLC, et al.*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (order approving a breakup fee of $650,000 or 3.1% of purchase price of $21 million); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving a $25 million, or 3% of purchase price, breakup fee); *In re Caldor, Inc.*, Case No. 95-B-44080 (JLG) (Bankr. S.D.N.Y. Feb. 4, 1999) (order approving breakup fees of $1,900,000 on purchase price of $75,735,000 and $3,550,000 on purchase price of $142,000,000 or approximately 2.5%). In addition, courts will also approve an additional expense reimbursement that is capped at a reasonable figure and provides that the stalking horse document such expenses.

27. Here, the proposed Break-Up Fee satisfies these criteria because, if paid, it will be a set amount of $93,600.00. As the bidding is set to begin at the Stalking Horse Bid pursuant to the APA, the Break-Up Fee will be approximately 3% of the purchase price for the assets.[3] The Break-Up Fee is reasonable and consistent with the range of bid protections typically approved

---

[3] The Break-Up Fee of $93,600.00 is approximated at 3% of the Stalking Horse Bid by using the total purchase price figure of $3,120,000.00 as set out in section 2.2 of the APA.

in bankruptcy courts in this District and elsewhere. Additionally, the Expense Reimbursement is reasonable based on the market, and similar expense reimbursements have been approved in this District. *See In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2011 WL 8006792 (Bankr. D. Del. Jan. 2, 2011) (authorizing the debtors to reimburse the documented fees and expenses of a stalking horse bidder up to a maximum of $25,000).

28. The Debtor believes that the Break-Up Fee and Expense Reimbursement, if implemented, are fair and reasonable to compensate the Stalking Horse Buyer for taking actions that will benefit the Debtors' estates. These bid protections will compensate the Stalking Horse Buyer for the time, diligence, and professional fees incurred in negotiating the terms of the definitive asset purchase agreement.

29. Also, the Debtors do not believe that the Break-Up Fee and Expense Reimbursement would have a chilling effect on the sale process. Rather, the Stalking Horse Buyer will increase the likelihood that the Debtors will receive the best possible price for the assets, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Buyer, and moreover, by allowing other potential bidders to utilize the Stalking Horse Bid as a platform for negotiations and modifications in the context of a competitive bidding process.

    **C.**    **The Additional Bidding Protections Should be Approved**

30. The Debtors also seek approval of the bid increments to be used at the Auction if there is a competitive bidding in this instance. In particular, the Debtors seek approval of the initial bid increment of $300,000.00 (which includes the Break-Up Fee and Expense Reimbursement), plus subsequent bid increments of $100,000.00. These bid increments are important as they will be used by the Debtors to move forward at the Auction in an efficient manner. In addition, the bid increments will give other potential bidders the necessary information they need in order to proceed with bidding both before and at the Auction.

31. The use of the APA with the Stalking Horse Buyer, upon which the initial bids, as well as bids at the Auction will be based, will enable the Debtors and other parties-in-interest to easily compare and contrast any differing terms of the Bids made by any potential competition and qualified bidders at the Auction.

32. The Debtors believe that the additional bidding protections, including the Break-Up Fee, the Expense Reimbursement, and the initial and subsequent bidding increments are fair and reasonable, are designed to maximize value, and are not likely to dissuade any serious potential bidder from bidding.

**FURTHER RELIEF**

33. The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, time is of the essence and it is imperative that the Debtors be permitted to consummate a sale on the timeline proposed. In order to maximize the value of the assets and minimize the estates' unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtors' estates and stakeholders.

**Notice**

34. Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) counsel for the Committee; (c) counsel to LSQ; (d) the Office of the United States Trustee; (d) any party that has previously asserted a secured interest in the Debtors' assets; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Approval Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

                                                  **BIELLI & KLAUDER, LLC**

Dated: August 23, 2017             */s/ David M. Klauder*
Wilmington, Delaware            David M. Klauder (No. 5769)
                                         Nella M. Bloom (No. 5430)
                                         1204 N. King Street
                                         Wilmington, DE 19801
                                         Phone: (302) 803-4600
                                         Fax: (302) 397-2557
                                         Email: dklauder@bk-legal.com
                                         Email: nbloom@bk-legal.com

                                         *Counsel to the Debtors*